Good morning, everybody. Welcome to the remote version of the United States Court of Appeals for the Fourth Circuit. We have three cases on for hearing this morning. The first is 23-6914, United States v. Boyd. Ms. Tarleton, whenever you're ready. Thank you, Your Honor. Good morning, and may it please the Court. Jackie Tarleton for Robert Boyd. Mr. Boyd was charged with the allegation that he possessed adult pornography, and as a result of that possession, that he would have serious difficulty refraining from child molestation if allowed to remain in the community. It did so against the clear weight of the evidence. First, the government failed to prove by a preponderance of the evidence that Mr. Boyd knowingly possessed the images. He quickly initiated contact with his probation officer, treatment provider, and lawyer, as soon as he, his computer was remotely accessed. That remote access of his computer allowed him to access the evidence in a way that would have been impossible for him to do without the help of a lawyer. His computer was supported by a forensic examination, and he passed a polygraph about it. Mr. Boyd immediately consented to search of his computer and the SD card. Officer Ellis found nothing suspicious on his computer, but nonetheless sent it off for forensic examination, which again confirmed that that computer did not access these images. The forensic examination offered no evidence that Mr. Boyd was aware of, accessed, or viewed the pornographic images. It found no unauthorized material on the laptop and conducted no analysis of any other device beyond her belief to determine whether those devices could have even accepted an SD card, let alone that they accepted this one or viewed these images. There was no forensic testimony in this case, which is remarkable. Usually in pornography cases, we expect that there was testimony from appellant and the district court found that appellant had repeatedly perjured himself and not to mention minimized his conduct. And doesn't that credibility determination by the district court only owe it some strong deference? That's fine, Your Honor. And Mr. Boyd has acknowledged his difficulty with telling the truth in the past. However, there is still a burden of proof on the government in this revocation proceeding. And so, in my view, the government has to put on evidence to get beyond a preponderance that it's more likely than not that Mr. Boyd knew these images were in his possession and that as a result of knowingly possessing those images that he was then sexually dangerous. And I don't believe the government's met that burden here, even if the district court was entitled to disbelieve Mr. Boyd himself. The government didn't put on anything separate and apart from Mr. Boyd's testimony that would establish that he had viewed these images. Mr. Tarleton, sorry to interrupt you, but maybe not any direct evidence, but in addition to the credibility issue, wasn't there evidence that the images in this case came from the same website or origin that the earlier images that he had been found with and either prosecuted with or had his release revoked? So we've got that evidence. And the very nature of the SD card would suggest, I mean, there's no question he had in possession the SD card. He didn't say otherwise. So how would those images have gotten on that card but for the fact that he owned it and put them on there? Two responses, Your Honor. First, with respect to the nature of the images. Yes, they were from the same website as previous images that Mr. Boyd had been convicted of viewing. However, the government put on no evidence that this was a particularly rare website. And this is a common target for folks who have this issue. So that age range is not unusual in these cases. What's more, the age range is not unusual, but the particular website and the actual name of the website being the same one that he had been found with having images from a decade earlier, that seems much more than a coincidence. It was the same, but Your Honor, there was no evidence put on about how rare these images are in these kinds of cases. And even if the court believed that Mr. Boyd knowingly possessed them, I still believe the government never proved by a preponderance that he ever accessed or viewed them. And that, I think, is really significant in this case. And I know you had another part two answer to Chief Judge Diaz's question, and I interrupted. So go ahead and continue. I did. And with respect to the SD card, he acknowledged that he possessed the SD card. It was a little odd that it got sent off and the images came back on a different SD card. But even assuming that it's the same that was seized from him, he was living in a housing complex that had a lot of supervisees. And so he said that he borrowed the SD card from someone else. And so it's possible that those images had already been loaded by someone else and that he was unaware of that. From a neighbor that he didn't know and couldn't identify what apartment they were in. That was his testimony. That's true. But I still think there is a burden on the government by a preponderance to show that he ever accessed or viewed these. And it's not hard. And that neighbor, again, sorry about this. It's just the nature of the beast. A neighbor who apparently himself was a sex offender. Do I have that right? We don't know. We don't know. Didn't you just say that the apartment housed a number of people that were on supervised release or might be sex offenders? Yes. And we don't know who the images came from or who the SD card came from. But my point is that I would have expected the government to present forensic analysis to say this is when the images were loaded on the SD card. This is when they were accessed. This is when they were viewed and possibly by what device. There was a suggestion that Mr. Boyd viewed these images on something other than his laptop. But the government never sought to examine any other devices, never established that any of those other devices even could receive an SD card, let alone that it had used this SD card. And one of those other devices. Was he allowed to have those other devices? So there were a few that were discussed in the testimony. The computer was the laptop that Mr. Boyd was permitted to have. It had remote com software that never alerted to any inappropriate conduct. And the forensic examination of that computer showed no unauthorized images were present. The gab phone had no Internet access. There was no testimony or evidence that it could accept an SD card or that it had accepted this SD card. He had a tablet with no Internet access that he was permitted to have. There was no testimony about that being able to receive an SD card or receiving this SD card. Was there evidence that he claimed that he used the SD card for gaming? Yes, to store a game. Okay. But in order to store that game, you would have had to have loaded the game onto the SD card, right? Yes. And he admitted that he loaded the game on the SD card, but we don't have any testimony or forensic evidence about him accessing these other images. And we don't know if they were in allocated or unallocated space. We don't know if they had ever been opened. We just don't know anything about them. Ms. Tarleton, as I understand it, the condition of relief says possession. It doesn't say viewed or accessed. So how is it then that the government has to prove that he accessed them as opposed to simple possession, which is the condition of the release? I think it's relevant in two ways, Judge Berner. First, I do believe that knowing possession is inherently required in order to revoke someone's conditional release under Condition 37, which he was alleged to have violated in this case. But also, Perkins and McNair established that there's a second finding that must be made, which is that as a result of this violation, that he is then sexually dangerous. And sexually dangerous in this context means that he will have serious difficulty refraining from sexually violent conduct or child molestation. I think it's already a leap to say that possession, even knowing possession of legal pornography, makes someone have serious difficulty refraining from child molestation. But even assuming that's true, I think it at least requires that the person was viewing that material or knew it was there or accessing it in some way. Otherwise, it might even be evidence of volitional control to know those images were there and choose not to view them. The expert who made the assessment that he was sexually or could be sexually dangerous, did he rely on the notion that your client would have had to view the images? I think he assumed, as the district court did and as the forensic examiner did, that Mr. Borden... The reason I asked that, and I'm sorry to interrupt you again, but it's because it wasn't just that, although obviously that was critically important. But there was other indicia that he was having trouble complying with his conditions of release, including engaging in conversations with a pubescent teenager, I guess, at a Burger King. And viewing, maybe not explicit pornography, but sexually suggestive videos on TV and other outlets. So admittedly, the evidence of the SD card and the pornography therein was critically important, but it wasn't the only evidence, right? That's true, but I think there are flaws in that other evidence. First, with regard to the TV that he was watching, he did purchase a smart TV and the testimony was that he was viewing art, albeit some of those art images had nude bodies in them. But did the probation officer permit him to have the smart TV? No, but he was not expressly prohibited from it. Once he bought it, the probation officer saw it, told him to return it, and he immediately did. Did he have two smartphones? He had a gab phone, which he was permitted to have. He had a tablet with no internet access, which he was permitted to have. And he purchased, without authorization, a tablet with internet access, but that was still in the box unopened when Officer Ellis came to his home. With regard to the smart TV, I do think it's important to recognize this is someone who's institutionalized, has been in prison for decades. And frankly, I don't fully understand how smart TVs work. And so the fact that he purchased it, but immediately upon being told it was not appropriate for him, returned it and there was no further question. No revocation motion followed from that incident is important to recognize. With respect to the Burger King, first of all, I want to say that it's important. This court recognized in Antone that these folks participate honestly and forthrightly in treatment. Mr. Boyd did that in this case. Absent his own contacting of his probation officer, no one would have known about this SD card. No one would have known about this contact at Burger King. The contact at Burger King... Was he the first one to bring up the contact at Burger King? He was. Officer Ellis asked anything you want to talk about. It was a very generic question. And I guess no one would have known about the multiple contacts at Burger King or the SD card at the time they found out about it because he contacted him. But eventually, that would have come to light. Perhaps. I mean, I think the Burger King, first of all, the multiple instances, I don't think is supported by the record. The only person who was present was Mr. Boyd. And he said that the incident happened once and that there were multiple discussions with Officer Ellis about that one incident. There's no indication whether this young man was underage or not. And honestly, he did exactly what we hope he would do during an incidental contact out in the community. Can you explain the... And I do recognize that he did call his probation officer about this SD card. But as I read everything, it seemed like his story about the SD card evolved from what when he first called the probation officer and what he told him then to what he told the probation officer when he showed up at the house. Respectfully, Your Honor, I would disagree. I think he did acknowledge that his computer was hacked. That was confirmed by the forensic examination that this ultra viewer remotely accessed his computer. There was some confusion about whether bank information was requested. But Officer Ellis was very equivocal on that testimony. He said he didn't really remember. He wasn't computer savvy. So I don't think that Mr. Boyd's story changed in any material respect. And I do think it was confirmed by the forensic examination that was ultimately conducted by Ms. Thiemann, that his computer was remotely accessed. With regard to that, I just want to go back to the Burger King for a moment, if I might. I don't think it's supported that there were multiple instances. I think Mr. Boyd was doing a lot right. Antone recognized that these pedophilic and hepaphilic conditions are lifelong. These are something that these folks will struggle with forever, even once they're released into the community. And so what we are asking for them once they are released is that they can encounter these situations in the community and that they deal with them with their treatment provider, with their probation officer, with their lawyer, as Mr. Boyd did in this case. He immediately called his probation officer, his treatment provider and his lawyer when his computer was remotely accessed. He discussed the incident in the Burger King and it didn't escalate in any way. He talked about some thoughts that he had, but he didn't approach the young man. He didn't pursue it any further. And that's what we want to happen. Antone gave the example of alcoholism. If someone who suffers from alcoholism passes wine in the grocery store, one might expect them to have thoughts about it and to talk with their resources about those thoughts. But if they don't buy the wine and they don't take it further, that's a success. And that's what we want to happen. And that's what happened in this case. Mr. Boyd also talked about other times when he successfully dealt with situations in the community. There were two instances where young men boarded buses, public transportation that he was on, and he got off the bus. He was participating with his sex offender treatment. He was participating with medical and mental health treatment from the VA. He was registering as a sex offender as he was required. A lot of the testimony from Officer Ellis about why did he have this, why did he have that, those things had not been expressly prohibited before. So I think when Mr. Boyd was made aware of a violation or a problem in his time in the community, he responded appropriately. He returned the smart TV. He cooperated with Officer Ellis and initiated that contact with respect to this computer and SD card. So I think Mr. Boyd was not without his missteps, to be sure. But overall, he was doing well. I mean, even after this computer incident, he spent five months in the community continuing to participate as we would hope. Ms. Tarleton, can I ask you about the polygraph? And I'll begin by saying that I agree with you that it seems odd that someone would voluntarily turn over evidence that he might well know would lead to his revocation. But that wouldn't be the first time, I suppose. But it does strike me as suggesting anyway that he may not have known what was on that card. But what are we supposed to do with the polygraph evidence? You mentioned it, but it's not admissible evidence. It comes up in the papers, but do we consider it at all? And so in the face of cases that suggest otherwise. So what's your thought about that? I don't think it's necessary to this court's decision. I think in light of Mr. Boyd's struggles with honesty in the past, it's helpful to support his statements and his credibility on these specific issues. But I don't think it's necessary. I think what's important here to remember is that the government had the burden by a preponderance. Perkins and McNair established that that is true. They failed, in my view, completely to put on the appropriate record to support either that he knowingly possesses material or that as a result of possessing legal adult pornography, he would have serious difficulty refraining from child molestation. And where we're doing this complex analysis about previewing future behavior and incarcerating someone in a federal prison because of what we suspect they might do. I see my time is up. May I briefly conclude?  I think it's very important for this court to hold the government to its proof on the underlying facts, which I don't think they established here. I think it's important for this court to reverse. All right. Thank you very much. Ms. Petra. Morning. Jenna Petrie for the United States of America. And may it please the court. Good morning, your honors. This court is asked this morning to address whether the district court properly revoked Mr. Boyd's conditional release under the Adam Walsh Child Protection and Safety Act of 2006. This court should affirm the decision of the district court, finding that the 47 pages of oral findings entered into by the district court in this case amply support a finding by the preponderance of the evidence that Mr. Boyd both violated the conditions of his release and that as a result of those violations, he would have serious difficulty refraining from child molestation or sexually violent conduct. What supports the finding? What evidence was there that he knowingly possessed the images that were on the SD card? He certainly knowingly possessed the SD card, but what's the evidence that he knew those images were there? I think your honors have pointed to a number of issues already as it relates to the SD card that Mr. Boyd didn't know where it was from, couldn't tell us who provided it to him, which all begins kind of to be very suspect. But then during the forensic analysis of that card, what we see is that it was used both for SimCity and to have these 91 images of child pornography. And there were multiple files of SimCity on this SD card that were revealed during the forensic analysis. When Mr. Boyd was questioned about the use of the SD card, he specifically noted that it was used for gaming and admitted that he had put SimCity on the card. Now in order for him to use that gaming system, he would have had to access the card, access the files on the card, and then click on them in order to play those games. But I think Ms. Tarleton said there wasn't any forensic evidence as to where the images were, if they were in unused space, or like if he would have actually seen those even when he used the SimCity gaming on that card. That's correct, your honor. There's no specific evidence as to where those were contained. However, they were all on the same card. There's no indication that there were any file folders on the card, as the forensic analysis would have noted that. So to then posit that there were these separate secret places on the card, on the SD card, that could have been accessed seems to make little sense in this situation. And so based on that, the court made... My apologies. I just want to go back to something you said because I want to clarify. You said that on the card were found images that were child pornography. My understanding is that there was no such finding, that in fact what Judge Devere found was that there were images from a website that had included men that were of the age of majority. Is that right? Yes, your honor. My apologies, I did misspeak. I believe what the court specifically found were that the images were child pornography. The evidence presented by the government was that all of the images, the 91 images, contained nude individuals that may have either been under the age of 18 and thus children, or were individuals who were purposely appearing to be childlike in nature. Well, the website itself said teen studio, correct? That's correct. It was gayteenstudios.com. So anyone getting that website would have assumed it would have been teens. I believe that's correct, your honor. And the United States Probation Officer from the Northern District of Ohio, who viewed all of these images as part of his investigation, did indicate that while he could not be sure that they were teenagers, he felt that they were meant to look like teenagers, meaning that they didn't have a lot of musculature, they didn't have any facial hair, they had minimal pubic hair. The name of the website itself indicates that they're meant to look like teenagers, right? I agree, your honor, yes. But I do have another question about the forensic examination. Opposing counsel said the forensic examination actually showed that the computer was hacked, which would have corroborated Appellant's story. What's your response to that? I don't think the word hacked is perhaps the right word here, because I think it implies some kind of nefariousness that we don't have information related to. There was some kind of access to the computer by a third party, and that evidence was confirmed. However, it couldn't be sure whether or not Mr. Boyd had accessed it from his own phone or from his tablet in order to create this appearance that something had gone wrong. And perhaps the mere fact that he had plugged in the SD card to his computer, knowing that there was child pornography, is what precipitated this whole event. We can't be sure, because as the court noted in this case, Mr. Boyd was historically deceptive and manipulative of the evidence. He often downplayed or minimized his own behaviors. And in fact, in this court case, the district court determined that he was not credible and inferred the opposite of his testimony. What about the fact that, I'm sorry to interrupt, that he was the one who brought all of this to the attention of the probation officer? The government would not have otherwise known about this, but for the fact that he came forward with a computerized act, you say maybe it wasn't, maybe there was something nefarious about that. But all that, you know, what troubles me is that he came forward and laid this all out for the government. I certainly understand the court's concern about that issue. Unfortunately, I can't deem to imagine what Mr. Boyd was thinking in those moments and why he might have called his probation officer. As I mentioned, for all we know, it could be because he accidentally plugged the SD card into his computer and prayed that the remote access and all of that, the files by the probation office would sense those images on the SD card. I can't begin to guess why Mr. Boyd called, but I think what's relevant is what Judge Thacker noted earlier, that Mr. Boyd's story changed over the course of the events and it even changed when he was at the hearing. Initially, when he called Officer Parrish Ellis, who was the probation officer in this case, he indicated that he believed that his computer was locked because someone in the apartment complex had accessed child pornography. Then upon Officer Parrish Ellis' arrival at the home, it was, oh, there might be child pornography on my computer. And never did he indicate that there was anything with his banking information. He didn't indicate that he had had to call anyone. But then when we get to the hearing, all of a sudden he had to call two different people. He had to provide banking information. And so the story seemed to develop in somewhat of a strange way. And I think what it all boils down to is the fact that this can't just be a coincidence. In 2010, Mr. Boyd was caught with multiple images from the same exact website, GayTeenStudios.com. He has a copious history of possessing either pornography or child pornography. He was kind of noted in the original commitment hearing to be somewhat of a collector of child pornography, someone with both hands-on cases against children and a collector of child pornography. And so then when we see it here, these 91 images squarely within the type of individuals that Mr. Boyd has predated on historically, the type of individuals he's always been interested in, these teenage boys or these appearing to look like teenage boys, this can't be purely coincidence. There was not a single female in any of the images, not a single child or person appearing of pubescent or younger age. So all of this evidence really added up for the district court to help that finding by a preponderance of the evidence as required by this court in United States v. Perkins to make that first finding of our analysis that he did in fact violate the conditions of his release. And let me make sure I understand your answer to my very first question about the evidence that he knowingly possessed the images, not just that he knowingly possessed the SD card. It's that the Sim City game was on there and had been accessed on the SD card. It's that the Gay Teen Studio website is the same one that he had accessed a decade earlier and also that the images were the type of individuals he's consistently been interested in since the time he was in his early 20s. Yes, Your Honor. Anything else? I believe the additional piece that the district court did consider in this case is that Mr. Boyd specifically denied knowledge of the child pornography and denied possessing the child pornography. And as I noted earlier, the court did find that because he had perjured himself and because he had previously minimized his conduct that it could infer the opposite of that testimony. So I do believe that that's an additional piece that the district court considered in making its finding and it noted that in its oral pronouncement of the opinion. There was a... Ms. Tarleton mentioned that the SD card, there was no evidence that the government presented no evidence showing that the card itself had been accessed or files within the card had been accessed. And maybe this isn't in the record and if it isn't, you may not be able to answer. But is there a way to do that to show whether or not a particular file on an SD card has been accessed, Your Honor? And I certainly don't believe that there's a way to show that a specific device has accessed anything off of a card. Because the card is the storage device and so all of that would be stored on there. There's no storage on the actual device system. And so I don't believe that that would be the case. And moreover, Your Honor, I would know... Sorry, if he had accessed the card after inserting it in the computer, the software designed to detect that would have shown that, right? Quite frankly, Your Honor, I'm not sure that it would have detected it unless that particular image was opened on the computer. I'm not sure whether or not the security that was placed on those devices by United States Probation has the ability to detect the SD card and items contained on a separate storage device. And there was no information in the forensic report related to that. Okay. Because I thought, going to the forensic report, I thought the question was about the forensic exam, not whether what the probation put on it could tell, but whether the forensic exam could tell whether the images had been accessed or not. Because I thought the forensic exam said that SimCity had been accessed. You could tell that SimCity had been played on there. So why couldn't the forensic exam also tell whether or not the images had been accessed? Your Honor, I'm unsure that that's precisely what the forensic exam said. I believe what the forensic exam noted was that SimCity had been placed on the card multiple times and that there were numerous files. I don't believe that the forensic examination was able to indicate specifically the number of times that they had been accessed. Okay. Ms. Mitri, I do find it disturbing that the forensic report itself was never put into evidence, that Officer Ellis was permitted to testify about what the report said, but the report itself was not put into evidence. Is that right? No, Your Honor. So the United States did submit that report into evidence and it was accepted, or excuse me, it was not accepted by the court, but it was considered by the court in that the court allowed each of the experts to use the information gleaned from that report. The court declined to enter it into evidence and did not submit it for the truth of the matter, but did allow both the probation officer and both of the experts to testify related to it. So we have no way on appellate review to know what actually was in the report apart from what the experts said was in it? Well, it has been submitted as part of the joint appendix in this case, and so it is included for this court's consideration, and I'm happy to provide a JA site if that would be helpful to the court. That would be helpful. Thank you. Absolutely, Your Honor. The forensic report is located at JA 454. And one of the significant things, I think, we've heard Mr. Boyd argue numerous times throughout today and in his brief that the government was required to have certain testimony or certain specific evidence in this case, and that's actually not true. So this court in United States v. Mason noted that the government is not required to use any specific investigative techniques, nor is it required to present any specific evidence of that kind to the finder of fact. I think the point opposing counsel was making is that the government does have the burden of proof and needs to present evidence sufficient to meet that preponderance of the evidence burden. That's the way I took what opposing counsel was saying. Yes, Your Honor, and I believe that the United States did meet that burden of preponderance of the evidence here, and I think the court... And what's our standard of review now on appeal? It's clear error, Your Honor, and so this court might hear all of the evidence and determine perhaps that it would have decided the case differently had it been the finder of fact, but that's not the standard under clear error. Rather, this court has to be left with a definite and firm conviction that a mistake was made based on the totality of the evidence. And I think that that piece is really important here because what I think Mr. Boyd is asking this court to do is to view this violation somewhat in a vacuum, right? To consider nothing else except for the fact that he had pornography in his possession. And that's not supported by this court's decision in United States v. Perkins or United States v. McNair, nor does it really make sense when we consider the violation of someone being in the community. Rather, I think it's really important here that we look at every little thing that Mr. Boyd was doing in the community, and that's exactly what the district court did in making and rendering its decision, especially as it relates to the second prong of the analysis, which is whether in light of the violation conduct, Mr. Boyd would be sexually dangerous to others if he continued unconditional release. And for the court, what it really felt was that Mr. Boyd was building and escalating his conduct over the course of time, and while Ms. Tarleton noted earlier that Mr. Boyd was in the community for five months after being caught with the pornography while they underdid an analysis and he was fine and great, that's actually not what the record says. What the record tells us is that while we were waiting for the forensic analysis to come back, this is when Mr. Boyd was going to Burger King time and time again every time he had a meeting with his provider in the community, and that on at least three occasions he reported being waited on by a teenage boy and having some kind of feelings or expectations that this child was flirting with him or interested in him in some way. And didn't either his counselor or the probation officer or both tell him then stop going to that Burger King but he still kept going back to it? That's exactly right, Your Honor. And Mr. Boyd from years of being in treatment, from being in the community where he alleged that he was getting so much more out of treatment than he ever got while he was in the commitment and treatment program at Butner, he should have known that he was putting himself in a situation where he was attempting himself to offend, right? We heard him testify somewhat self-servingly that he got off the bus because a kid sat next to him or he had removed himself from these other bad situations. But now, all of a sudden, we see him putting himself in the same bad situation time and time again. And even during his testimony during trial when questioned about whether or not he was attracted to boys in this age range or whether he was attracted to the boys at Burger King, he initially denied that and said no. And then, when pushed further, he admitted, well, maybe for a second I thought about it. Maybe for a second I thought about calling or asking for their phone number. Like, maybe for a second I thought that they were flirting with me. Well, but Ms. Tarleton says that's the whole reason why he is where he is. He just, he's got this lifelong disease that he has to deal with, condition, and related to the Burger King incident, once again, this was the, Mr. Boy coming forward to his probation officer saying,  here's what happened. Here's what I'm doing.  you know, again, the probation officer would not have had any reason to know about that for the fact that Mr. Boy came forward and admitted that he had these feelings again. I don't disagree with the court on that point, but what,  I apologize, Judge Berner. Thank you. I know this is difficult. It's hard to navigate court on Zoom. I just wanted to follow on Chief Judge Diaz's comment because I'm looking at the revocation statute and the language of the statute says that the court shall remand to a suitable facility in light of an individual's, and this is the language, failure to comply with the prescribed treatment of medical,  or psychological care or treatment. And I don't see any evidence that Mr. Boy actually failed to comply with the prescribed regimen of medical,  or psychological care or treatment. In fact, what strikes me is that there was compliance of all of the requirements of care or treatment. I hear you speak about perhaps indications of potentially going down a path towards sexually dangerous behavior, but that doesn't seem to be treatment related. In fact, he was complying with his treatment related conditions. Was he not? It does appear that he was complying at least superficially, though I think there's evidence in the record that even the social worker who was working with him in the community had concerns about him, especially related to the Burger King incidents, Your Honor. Well, what the statute says is the remand is if the remand  compliant with the prescribed regimen of medical, psychiatric, or psychological care or treatment. And again, I don't see or hear you speaking of any evidence that there was a failure to comply with the prescribed regimen of treatment. Your Honor, I see that my time has just expired. I would like to take the opportunity to address both yours and Judge Diaz's questions, if I may. Go ahead. So beginning with as it relates to the prescribed regimen of medical,  or psychological care that's prescribed by 18 U.S.C. 4248, I believe that this Court is actually hearing another very similar case on this idea of ancillary conditions. And so what has been argued, I believe, in that case, and I think, if I'm correct, that it's United States v.  There's also United States v.  which is pending the final decision of United States v. Roney on the same issue. But what the issue is in that specific case and what the issue is here is whether or not the District Court in placing conditions on a person can include what some other courts have called quote-unquote ancillary conditions. So these are conditions that are related to the prescribed regimen of medical,  or psychological care, but not necessarily specific to treatment or medication or sex offender treatment. And so, for example, the court might find here that these conditions, these ancillary conditions, would be necessary to protect the public under the Adam Walsh Child Protection and Safety Act. So to say that a person should be able to view pornography or child pornography would be directly contravening to the purpose of the Adam Walsh Child Protection and Safety Act, but might not be something that this court would consider part of the prescribed regimen of medical,  or psychological care. And so, it seems that it would make little sense for this court to determine that the viewing of pornography would be something that the district court could not enforce in this case, especially because we're talking about someone who is both a hands-on offender and an offender via the use of pornography. I hope that that appropriately answered this court's question.  surely part of the psychological care is that you don't look at images of child pornography. I agree, Your Honor, and I do believe that the prohibition on using or possessing pornography in this case, it does fit squarely within the prescribed regimen of medical,  or psychological care. You were also going to answer Chief Judge Diaz's question. Yes, Your Honor, so as it relates to Chief Judge Diaz's question, I think something that's worth noting here is not just that Mr. Boyd was notified to his probation officer. So all contact with underage individuals, specifically under the age of 18, under his conditional release order, was required to be provided or notified to United States probation within 24 hours. And the district court did note that in part of its consideration. And as I think we've heard argument on this morning, Mr. Boyd did tell his  officer, but only when prompted or asked, are you having any sexually deviant thoughts? Is anything happening that's making you maybe feel a certain type of way? And he immediately reported having concerns about these issues.     he should have been able to also self identify that he should not go back and should not put himself in that situation again. But on May 20th, he reported that he had had another interaction. And on June 4th, he reported another interaction. And so he wasn't really policing his own behavior, and he wasn't doing what was expected of him. And so for all of the reasons that I think the court noted, the court found that there was a pattern of overwhelming evidence that supported that Mr. Boyd was participating in deceptive and escalating risk-relevant behavior. And as Dr. Fox stated during his testimony, he was on the precipice of reoffending, and the district court was not required to wait for him to reoffend before revoking him. And so unless there are any further questions of the court... I just have one quick clarification. Of course. This U.S. v. Nathaniel Williams is still pending the final determination in that case, and so I believe that it's still under review. Thank you. Thank you,  If there are no further questions, I would ask that this court affirm the findings of the district court and affirm Mr. Boyd's revocation of his image. I think you're muted. I'll get the hang of the Zoom thing one day. First, I just want to start by confirming that on JA-437, the district court expressly said it's not finding that the images are child pornography. This was legal adult pornography that was prohibited for Mr. Boyd, but was not ever found to be child pornography. Second, with regard to the Burger King, pages JA-184 to JA-187,  repeated attempts by counsel at the revocation hearing, Mr. Boyd was adamant that this happened one time. He said there was only the one incident with one young man.  didn't say he never went back to that Burger King, but he didn't report ever seeing that young man again. So I think that is important on this record. Third,       I have a lot of respect for Ms. Petrie, so I just want to say something that she, throughout the course of her argument, she said, we can't be sure. I can't begin to guess. It can't just be a coincidence. And unfortunately, I think this is the same problem that plagued the district court proceedings in this case. In Perkins, this court said, our review of the record leaves much room for speculation where none should exist. And I think there's just too much speculation in this case. Can I ask you a question about something else Ms. Petrie said regarding the standard of review, which is always good to come back to? You know, you've done a really good job of  that there might be some ease by a judge to  that the judge was clearly wrong or clearly erroneous given the evidence that is in the record? Yes, your honor, I think we can.  the court disbelieved Mr. Boyd and chose to revoke him and sent him back to indefinite federal prison based on speculation and his disbelief of Mr. Boyd's testimony. Where was the forensic exam? Where was the testimony establishing that he viewed these images? Where was the testimony that linked his viewing, which I don't think has been established, of this pornography to a serious difficulty refraining from child molestation? I think, you know, as I started to say in my opening argument... The one through three experts that said that,  that he would have a serious issue? Eric Fox was the expert who testified that Mr. Boyd would have serious difficulty refraining, but I         And I understand why, because he's not a forensic analyst, a forensic computer analyst. He was assuming that those facts had been established, which is something that experts in these cases commonly do. The problem here is that there was no such forensic analysis to support this revocation, and here we're talking about preventive detention. This is not a traditional criminal case. This is preventive detention based on what a court believes a person might do in the  Engaging in that kind of analysis is difficult. Judge Richardson has said these types of cases require tough evidence, and I would urge this court to follow its tradition of not giving the government a second bite at the apple when it cannot establish by sufficient evidence a revocation in the first instance. That's Pettis in the sentencing context, Nixon in the sentencing context, and both of those are the same case. I would urge this court to follow its tradition of not giving the government a   apple when   by sufficient evidence a revocation in the first instance. I would urge this court to follow its tradition   government a second bite at the apple when it cannot establish    the first instance. Thank you. Thank you.
judges: Albert Diaz, Stephanie D. Thacker, Nicole G. Berner